**RCO Legal, P.S.**
13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax: 425.458.2131
www.rcolegal.com

Honorable Judge Randall L. Dunn
Chapter 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re:

Brandon Michael Stalwick, dba Pacific Crest
Contractors and
Colleen Michelle Stalwick, aka Colleen M
Gleeson, aka Michelle Colleen Stalwick, fka
colleen Michelle Gleeson

                                        Debtors.

Case No. 15-31954-rld7

UNITUS COMMUNITY CREDIT UNION'S
OBJECTION TO NOTICE OF INTENT TO
SELL PROPERTY AT PRIVATE SALE

COMES NOW Unitus Community Credit Union, ("Creditor"), and objects to the Trustee's Notice of Intent to Sell.

## I.     BACKGROUND

On or about January 12, 2013, Colleen Stalwick executed and delivered a note in favor of Unitus Community Credit Union in the original principal amount of $197,400.00. This Note was secured by a Deed of Trust ('Deed') encumbering real property commonly described as 15128 SE Belmore Street, Portland, OR 97236 ('Property'). Creditor is the holder of the note or services the note for the holder.

Creditor is the holder of the note or services the note for the holder. The outstanding balance due on the Note as of filing was approximately $181,176.46. As of the same date the loan was contractually due for the February 1, 2015 payment.

The Court granted relief from the automatic stay to Creditor on June 2, 2015.

Foreclosure is currently pending. On July 16, 2015 Creditor recorded the Notice of Default in the Multnomah County Official Records under recording number 2015-088846.

UNITUS COMMUNITY CREDIT UNION'S
OBJECTION TO NOTICE OF . . .   PAGE - 1

RCO
Legal, P.S.

13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax:    425.458.2131

Case 15-31954-rld7     Doc 27     Filed 08/10/15

## II.    AUTHORITY AND ARGUMENT

Creditor objects to the Trustee's Motion on the basis that the sale violates the terms of Creditor's security interest and the sale is part of a greater scheme to hinder and delay foreclosure.

### A.    Debt owed to Creditor must be paid in full upon sale of the Property:

Creditor objects to the Trustee's proposed sale of the Property on the basis that the sale will not generate sufficient funds to pay the debt owing to Creditor in full.  The Trustee proposes to sell the Property for $5,000.00 to Turning Leaf Homes, LLC.  The sale is for bare legal title to the property subject to all encumbrances.  The debt owed to Creditor will not be paid in full from the sale.  Pursuant to the terms of the Deed of Trust the debt owing to Creditor must be paid in full upon sale or transfer of the Property.  Specifically paragraph 18 of the Deed of Trust provides:

> "Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument."

See as Exhibit A a true and correct copy of the recorded Deed of Trust.  Creditor does not consent to the sale or transfer of the Property without the debt being paid in full upon sale or transfer. The sale should not be allowed without payment in full of the debt owed to Creditor.

### B.    Sale of Property is Part of  Scheme to Hinder and Delay Foreclosure:

Creditor also objects to the sale of the Property to Turning Leaf Homes, LLC on the basis that the sale is part of scheme to hinder and delay foreclosure.  Turning Leaf's intention with the purchase of the Property is to tie up the Property in litigation and rent it for as long as possible, and try to extract additional settlement money from Wells Fargo.[1]  Turning Leaf is believed to be affiliated with Big Blue Capital Partners, LLC[2], which has filed lawsuits after purchasing distressed properties.  *See Big Blue*

---

[1] See as Exhibit B a true and correct copy of Purchaser's marketing materials obtained from the website www.livinglies.wordpress.com specifically at http://livinglies.wordpress.com/2011/11/19/new-solution-is-the-homeowner-protected/
[2] Big Blue and Turning Leaf have common ownership.  *See* Exhibit B, paragraph 3, line 2.

UNITUS COMMUNITY CREDIT UNION'S
OBJECTION TO NOTICE OF . . .   PAGE - 2

RCO
LEGAL, P.S.

13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax:    425.458.2131

Case 15-31954-rld7    Doc 27    Filed 08/10/15

*Capital Partners, LLC v. ReconTrust Co. ("Big Blue I")*, 2012 WL 1605784 (D.Or. May 4, 2012)(courtesy copy attached), *Big Blue Capital Partners, LLC v. ReconTrust Co. ("Big Blue II ")*, 2012 WL 1870752 (D.Or. May 21, 2012)(courtesy copy attached), *Big Blue Capital v. ReconTrust Co. ("Big Blue III ")*, 2012 WL 2049455 (D. Or. June 4, 2012)(courtesy copy attached). The Court's opinion in *Big Blue I* described the purchasers as follows:

> Further, the record makes clear that [Big Blue's] sole purpose in initiating this suit was to frustrate and delay non-judicial foreclosures under the OTDA in order to exact a settlement from the lender; plaintiff capitalizes on this ruse by purchasing properties, at a fraction of their value, from borrowers who have already materially defaulted on their loan obligations.

*Big Blue Capital Partners, LLC v. ReconTrust Co. ("Big Blue I"), 2012 WL 1605784 (D.Or. May 4, 2012).* Turning Leaf Homes, LLC purchases homes from bankruptcy and then either intervenes in the judicial foreclosure action raising frivolous claims regarding the securitization thereby prolonging the duration of the foreclosure action or files frivolous law suits. By intervening in the foreclosure action or commencing an action against the Creditor and foreclosure trustee, Turning Leaf Homes, LLC is able to delay the foreclosure by a minimum of 4-6 months.

### C. Turning Leaf should not be allowed to purchase the property because it frustrates the purpose of the Bankruptcy Code

The sale of the Property to Turning Leaf, LLC frustrates the purpose of the Bankruptcy Code and should not be allowed. By purchasing the property from the bankruptcy estate or debtor after filing bankruptcy, Turning Leaf Homes, LLC and the debtors are able to avoid the possible ramification of 11 U.S.C. §362(d)(4) which provides that relief from stay will be granted In Rem if the property was transferred as part of a scheme to delay, hinder or defraud Creditor by transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval. The transfer of the Property is part of a scheme to delay, hinder or defraud Creditor. Use of the bankruptcy Court and bankruptcy process should not be allowed for that purpose. The proposed sale and should not be allowed or approved by the Court.

UNITUS COMMUNITY CREDIT UNION'S
OBJECTION TO NOTICE OF . . .   PAGE - 3

RCO
LEGAL, P.S.

13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax:    425.458.2131

Case 15-31954-rld7    Doc 27    Filed 08/10/15

1

Second, the transfer of the Property to Turning Leaf would further frustrate the purposes of the

2

Bankruptcy Code because the transfer would both compromise the security interest held by Creditor, and

3

would also result in a distribution to the general unsecured creditor, through the payment of funds to the

4

estate, who would be paid from funds derived from the secured property before the secured Creditor was

5

paid in full. Use of the bankruptcy Court and bankruptcy process should not be allowed for that purpose.

6

The proposed sale and should not be allowed or approved by the Court.

7

### III. CONCLUSION

8

WHEREFORE, based on the foregoing, Creditor respectfully requests that the court deny the

9

Trustee's request for approval of sale of the Property or in the alternative requests that an evidentiary

10

hearing be scheduled on the matter.

11

DATED August 10, 2015.

**RCO LEGAL, P.S.**
ATTORNEYS AT LAW
Attorneys for Creditor

12

13

14

/s/ Jennifer L. Aspaas

15

By: Jennifer L. Aspaas, OSB #032357

16

17

18

19

20

21

22

23

24

25

26

UNITUS COMMUNITY CREDIT UNION'S
OBJECTION TO NOTICE OF . . .    PAGE - 4

RCO
LEGAL, P.S.

13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax:    425.458.2131

Case 15-31954-rld7    Doc 27    Filed 08/10/15

The Honorable Judge Randall L. Dunn

UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Brandon Michael Stalwick, dba Pacific Crest Contractors and<br>Colleen Michelle Stalwick, aka Colleen M Gleeson, aka Michelle Colleen Stalwick, fka colleen Michelle Gleeson,<br><br>                              Debtors. | Chapter 7 Bankruptcy<br><br>No.: 15-31954-rld7<br><br>CERTIFICATE OF MAILING |

CERTIFICATE OF MAILING

I hereby certify under penalty of perjury under the laws of the State of Oregon that I mailed a true and correct copy of the Unitus Community Credit Union's Objection to Notice of Intent to Sell via postage pre-paid, regular first class mail or via Electronic Message through Electronic Case Filing on the 10th day of August, 2015, to the parties listed on the attached exhibit.

DATED this 10th day of August, 2015.

/s/ Tony Chhay
Assistant to Attorney

Certificate of Mailing
Page - 1

RCO
LEGAL, P.S.

13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax:    425.458.2131

Case 15-31954-rld7    Doc 27    Filed 08/10/15

1

2      Brandon Michael Stalwick
       11500 SE 119th Drive
3      Happy Valley, OR 97086

4
       Colleen Michelle Stalwick
5      11500 SE 119th Drive
       Happy Valley, OR 97086
6

7      Adam M Weiner
       8624 SE 13th Ave.
8      Portland, WA 97202
       adam@bankruptcylawportland.com
9

10     Chapter 7 Trustee
       Stephen P. Arnot
11     P.O. Box 1963
       Lake Oswego, OR 97035
12     arnotlaw@sbcglobal.net

13     JPMorgan Chase Bank, National Association
       JAMES J NICITA
14     920 SW 3rd Avenue, 1st Floor
       Portland, OR 97204
15

16

17

18

19

20

21

22

23

24

25

26

Certificate of Mailing – Exhibit
Page - 2

RCO LEGAL, P.S.

13555 SE 36th St., Ste. 300
Bellevue, WA 98006
Phone: 425.458.2121
Fax:    425.458.2131

Case 15-31954-rld7    Doc 27    Filed 08/10/15

UNITUS COMMUNITY CREDIT UNION
PO BOX 1937
PORTLAND, OR 97207

MAIL TAX STATEMENT TO:
UNITUS COMMUNITY CREDIT UNION
1300 SW 6TH AVE
PORTLAND, OR 97201

| Multnomah County Official Records | **2013-009051** |
| R Weldon, Deputy Clerk | 01/18/2013 11:26:52 AM |
| 1R-TR DEED Pgs=15 Stn=21 ATESB | |
| $75.00 $11.00 $15.00 $10.00 | **$111.00** |

CHICAGO TITLE

——————————————— [Space Below This Line For Acknowledgment] ———————————————

## DEED OF TRUST COVER PAGE

This Cover Page **MUST** be attached with your recordable document

1. Grantor/Borrower Name(s) and Address:
   Colleen M Stalwick
   4716 110th Avenue NE, Kirkland, WA
   98033

2. Grantee/Lender Name and Address:  UNITUS COMMUNITY CREDIT UNION
   1300 SW 6TH AVE
   PORTLAND, OR 97201

3. Trustee Name and Address:  KEVIN P. MORAN, ATTORNEY AT LAW
   9057 WASHINGTON AVENUE NW
   SILVERDALE, WA 98383

4. Beneficiary Name and Address:  UNITUS COMMUNITY CREDIT UNION
   1300 SW 6TH AVE
   PORTLAND, OR 97201

Or. Rev. Stat. 205.234
Online Documents, Inc.

ORCOVER  1201



UNITUS COMMUNITY CREDIT UNION
PO BOX 1937
PORTLAND, OR 97207

Title Order No.: ███████
Escrow No.: ███████
LOAN #: ███████

──────────── [Space Below This Line For Acknowledgment] ────────────

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **JANUARY 12, 2013,**          together with all Riders to this document.

(B) **"Borrower"** is **Colleen M Stalwick.**

Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is **UNITUS COMMUNITY CREDIT UNION.**

Lender is a **CREDIT UNION,**                                organized and existing under the laws of **OR.**                                Lender's address is **1300 SW 6TH AVE,**
**PORTLAND, OR 97201.**

Lender is the beneficiary under this Security Instrument.

(D) **"Trustee"** is **KEVIN P. MORAN, ATTORNEY AT LAW.**

(E) **"Note"** means the promissory note signed by Borrower and dated **JANUARY 12, 2013.**          The Note states that Borrower owes Lender **\*\*\*ONE HUNDRED NINETY SEVEN THOUSAND FOUR HUNDRED AND NO/100 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** Dollars (U.S.     **$197,400.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **FEBRUARY 1, 2028.**

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- ☐ Adjustable Rate Rider
- ☐ Balloon Rider
- ☒ 1-4 Family Rider
- ☐ V.A. Rider

- ☐ Condominium Rider
- ☒ Planned Unit Development Rider
- ☐ Biweekly Payment Rider

- ☐ Second Home Rider
- ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the   County                                          [Type of Recording Jurisdiction] of

Multnomah                                  [Name of Recording Jurisdiction]:

Lot 25, MACGREGOR HEIGHTS, in the City of Portland, County of Multnomah and State of Oregon.
APN #: R494452

which currently has the address of **15128 SE Belmore Street, Portland,**

                                                                    [Street] [City]

Oregon     **97236**          ("Property Address"):
          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3038 1/01          Initials:
Online Documents, Inc.                        **Page 2  of  9**                                ORUDEED  1212

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3038 1/01    Initials:
Online Documents, Inc.                              Page 3 of 9                              ORUDEED   1212

Case 15-31954-rld7    Doc 27    Filed 08/10/15

proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3038 1/01
Online Documents, Inc.            Page 5 of 9        Initials: _____
ORUDEED 1212

completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address,

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3038 1/01     Initials: ____
Online Documents, Inc.                    **Page 6 of 9**                              ORUDEED 1212

then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

## WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need you have for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

Case 15-31954-rld7    Doc 27    Filed 08/10/15

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Colleen M. Stalwick_ (Seal)

Colleen M Stalwick

State of ~~OREGON~~ WA

County of: King

This instrument was acknowledged before me on 1/16/2013

by Colleen M Stalwick

Signature of Notarial Officer

_Notary_

Title (and Rank)

My commission expires: 5/1/2013

Notary Public
State of Washington
Zel Misic
Commission Expires 5-1-13

OREGON—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3038 1/01
Online Documents, Inc.                    **Page 9 of 9**                    ORUDEED 1212

## 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this   12TH   day of **JANUARY, 2013** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **UNITUS COMMUNITY CREDIT UNION, AN OREGON CREDIT UNION**

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:  **15128 SE Belmore Street, Portland, OR 97236.**

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

Initials:

MULTISTATE 1-4 FAMILY RIDER--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 31701/01
© 1999-2007 Online Documents, Inc.         **Page   1   of   3**         F3170RDU   0703

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

Initials:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_Colleen M Stalwick_ (Seal)
Colleen M Stalwick

# PLANNED UNIT DEVELOPMENT RIDER

CASE #:

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 12TH day of JANUARY, 2013 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to UNITUS COMMUNITY CREDIT UNION, AN OREGON CREDIT UNION

(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at: 15128 SE Belmore Street, Portland, OR 97236.

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in COVENANTS, CONDITIONS AND RESTRICTIONS

(the "Declaration").
The Property is a part of a planned unit development known as MacGregor Heights

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to ensure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid

Initials: [signature]

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 1/01
© 1999-2008 Online Documents, Inc.          **Page   1   of   2**                          F3150RDU   0802

to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____(Seal)
Colleen M Stalwick

We have a new solution for helping people in difficult situations like yours. In order to help you with your situation you must have recently been discharged from a Chapter 7 bankruptcy and have a loan that is owned in a privately securitized bond trust. Don't worry if you do not know this answer, we will help you figure this part out. It is important to remember that if your loan is owned by Fannie Mae, Freddie Mac, FHA or VA, we unfortunately cannot help you at this time.

We are only focusing on Chapter 7 homeowners at this time, as it alleviates for the most part the deficiencies, etc. and they are typically facing losing the home back to the bank very shortly. These homeowners are typically more educated with the process since they have addressed loan mods and short sales throughout the time in foreclosure and we can focus on business of acquiring, litigating and property managing homes. It's a much simpler process with post 7 people. We will consider Chapter 13 people but for now Marc wants to stay focused on the 7's as there are so many of them out there.

The Company was started by former Ohio Attorney General Marc Dann, who is a leading foreclosure defense litigator; Tracey Baron, founder of Turning Leaf Advisors, successful loss Mitigation Company and Robert Mittleman, Director of Education, Laurus Title Group.

Marc Dann and the Big Blue Legal Team will oversee the efforts to review all of the Chapter 7 Discharged properties to hone in on properties with first mortgage liens that can be challenged through litigation. Lawyers will evaluate the likelihood of success in litigating a lien strip or purchase of the first mortgage note by identifying properties where the mortgages are securitized and the security interest of the bond trust has not been perfected, where there are issues related to the fraudulent assignment of mortgages or failure to indorse promissory notes within in the timelines established by the pooling and servicing agreements that govern the bond trusts comprised of securitized mortgages.

Big Blue's legal operation will then oversee and pay for aggressive foreclosure defense or pro-active quiet title actions to challenge the standing of the alleged mortgage and note holders to foreclose on the acquired property. The Big Blue legal team will create brief and discovery banks and standards and intensively monitor lawyers hired to litigate cases.

What our company and partner Law Firms does is purchase your home subject to the existing mortgages and aggressively fight the lenders who are likely to foreclose on your home shortly. The purpose of this is to settle the outstanding liens using litigation.

We identify and acquire carefully pre-selected parcels of residential real estate owned by individuals who have been discharged from Chapter 7 Bankruptcy in situations where the Bankruptcy Trustee has abandoned any claim to the property.

Big Blue Capital Partners will acquire the interest subject to the mortgage after discharge, but before the mortgage holder seeks to foreclose and aggressively litigate the validity of the mortgage lien. Through this process, we will attempt to purchase the security interests in the properties at a substantial discount.



We are only focusing on Chapter 7 homeowners at this time, as it alleviates for the most part the deficiencies, etc. and they are typically facing losing the home back to the bank very shortly. These homeowners are typically more educated with the process since they have addressed loan mods and short sales throughout the time in foreclosure and we can focus on business of acquiring, litigating and property managing homes. It's a much simpler process with post 7 people. We will consider Chapter 13 people but for now Marc wants to stay focused on the 7's as there are so many of them out there.

Our team, led by experienced Lawyers, Mortgage experts, Title experts and Real Estate professionals, will take your place in the foreclosure process and if your property qualifies, and is accepted by us, we will aggressively litigate the imminent foreclosure process by the bank or lender, and take over the property entirely.

Should you be accepted into either of our programs all of the responsibilities related to the ownership of your home will shift to Big Blue Capital Partners, LLC and it's Law Firm. Should you decide to stay in your property, you will become a tenant with a genuine opportunity to regain ownership of your home if we are successful in our efforts by receiving an option to purchase the property back at some time in the future.

BIG BLUE LITIGATION TEAM:

BOWLES FERNANDEZ LAW LLC
Lake Oswego, OR

DANN, DOBERDRUK & WELLEN
Cleveland, OH

THE LARSEN LAW FIRM, LLC
Chicago, IL

MARK ZANIDES LAW OFFICES- a Former US Asst. Attorney General in the Bay Area.
Santa Ana, CA

LUSK, DRASITES, TOLISANO & SMITH
Cape Coral, Florida

PADDY DEIGHAN, Esq. PhD
Haddonfield, NJ

PROSPER LAW CORPORATION
Los Angeles, CA
Las Vegas, NV.

We are currently only working in these state right now in Oregon Massachusetts, Florida, Illinois, New York and California, where our counsel is Mark Zanides, a former US Asst.

Attorney General in the Bay area. We are being as conservative as we can in this area to make sure that we have all of our ducks in a row. We don't take on a property until we analyze the Pooling and Servicing Agreement and have a good handle as to the underlying issues with the mortgage.

We cannot help everybody, we do not work with GSE loans as they do not have the same improprieties as the privately secured bond trusts and they do not have the same type of guarantees that come along with government loans.

Listen Ladies and Gentleman, this is a true way to fight these lenders, our team is experienced and we want to help.

We will not be successful 100% of the time, however if we are careful with analyzing the characteristics of the underlying loan, we should be able to increase the likelihood of potential success, based on the current case law in each respective state, which is changing every day. The homeowner will have the option of staying in the home at a below fair market value rent during the litigation process. Our law firm & partners will only litigate through our program, To be considered into our program email me at: bmw@bigbluellc.com leave your contact info so we may send you the program packet.

B. Michael White
Big Blue LLC
Partner
925-478-1949
bmw@bigbluellc.com

2012 WL 1605784
Only the Westlaw citation is currently available.
United States District Court,
D. Oregon.

BIG BLUE CAPITAL PARTNERS, LLC, Plaintiff,
v.
RECONTRUST COMPANY, N.A.; The Bank of
New York Mellon fka the Bank of New York, as
trustee for the benefit of Cwalt, Inc., alternative
loan trust 2007–19 mortgage pass through
certificates, series 2007–19; and Mortgage
Electronic Registration Systems, Inc., Defendants.

No. 6:11–CV–06368–AA.    |    May 4, 2012.

**Attorneys and Law Firms**

John P. Bowles, Jeffrey A. Myers, Bowles Fernandez Law
LLC, Lake Oswego, Oregon, for plaintiff.

Pilar C. French, Kristen L. Tranetzki, Lane Powell PC,
Portland, Oregon, for defendants.

**OPINION AND ORDER**

AIKEN, Chief J.

**\*1** Defendants ReconTrust Company, N.A. ("ReconTrust"),
the Bank of New York Mellon fka the Bank of New York
("BNYM"), and Mortgage Electronic Registration Systems,
Inc. ("MERS") move to dismiss plaintiff Big Blue Capital
Partners, LLC's claims pursuant to Fed.R.Civ.P. 12(b)(1)
and Fed.R.Civ.P. 12(b)(6). In addition, defendants filed two
motions for judicial notice. For the reasons set forth below,
defendants' motions [1] are granted and this case is dismissed.

**BACKGROUND**

On April 2, 2007, Thomas and Trina Reid [2] took out a loan
from Plaza Home Mortgage, Inc. ("Plaza"), in the amount of
$455,000, to purchase a residential property (the "Property").
Pursuant to this transaction, the Reids executed a promissory
note (the "Note") in favor of Plaza. The Note was secured by
a trust deed (the "Deed of Trust"), which lists Plaza as the
lender, MERS as the beneficiary, and Ticor Title Company as

the trustee. The Deed of Trust was filed in Douglas County,
Oregon on April 6, 2007.

Pursuant to the Deed of Trust, the Reids agreed to make
monthly mortgage payments as required under the Note; the
Reids also agreed that they would be in default, and subject to
foreclosure, if they failed to make such payments. In addition,
the Deed of Trust required the Reids to obtain approval, in
writing, before selling or transferring their interest in the
Property.

In 2009, the Reids stopped making the requisite loan
repayments, thereby materially defaulting. On February 4,
2010, MERS assigned the Deed of Trust to BNYM, as trustee
for certificate holder CWALT, Inc. Also on February 4, 2010,
MERS appointed ReconTrust to serve as successor trustee
for the Deed of Trust. That same day, ReconTrust executed
a Notice of Default and Election to Sell the Property. On
February 8, 2010, the Assignment of the Deed of Trust,
Appointment of Successor Trustee, and Notice of Default
and Election to Sell were recorded in the official records of
Douglas County.

On December 1, 2010, ReconTrust issued a Rescission of the
Notice of Default, which was duly recorded in the official
records of Douglas County on December 6, 2010.

On December 9, 2010, the Reids filed a petition for relief
under Chapter 7 of the Bankruptcy Code. The petition
identified the value of their interest in the Property as
$450,000, subject to several secured claims, including one by
"Bank of America Home Loans" in the amount of $450,000.
The Reids, however, did not list any purported claims against
defendants as assets. On March 10, 2011, the bankruptcy
court granted the petition, thereby discharging the Reids'
debts.

On May 26, 2011, ReconTrust executed a second Notice
of Default and Election to Sell the Property. On May 31,
2011, the second Notice of Default and Election to Sell
was recorded in the official records of Douglas County.
The Notice stated that the foreclosure sale was scheduled
for October 6, 2011 at the Douglas County Courthouse. A
foreclosure sale has not yet occurred.

**\*2** On October 11, 2011, the Reids executed a quitclaim
deed, conveying their interest in the Property to plaintiff, a
limited liability company created under the laws of Ohio. [3]
Pursuant to that contract, plaintiff agreed to pay the Reids



Case 15-31954-rld7    Doc 27    Filed 08/10/15

$10,000 for the Property: $1000 immediately and $9000 "upon complete satisfaction of [plaintiff] in the negotiation and settlement of [the] underlying lien holder's interest."

On October 12, 2011, plaintiff filed a complaint in Douglas County Circuit Court; plaintiff asserts eight claims against defendants, all arising out of defendants' alleged failure to comply with the non-judicial foreclosure procedures outlined in the Oregon Trust Deed Act ("OTDA"). On November 18, 2011, defendants removed plaintiff's claims, on the basis of diversity jurisdiction, to this Court. Subsequently, defendants moved to dismiss plaintiff's complaint.

## STANDARDS

Where the court lacks subject-matter jurisdiction, the action must be dismissed. Fed.R.Civ.P. 12(b)(1). A challenge to standing is appropriately raised pursuant to Fed.R.Civ.P. 12(b) (1). *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir.2010). The party who seeks to invoke the subject-matter jurisdiction of the court has the burden of establishing that such jurisdiction exists. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). In such instances, the court may hear evidence regarding subject-matter jurisdiction and resolve factual disputes where necessary; however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the [court] from evaluating for itself the merits of jurisdictional claims." *Kinqman Reef Atoll Invs., LLC v. United States,* 541 F.3d 1189, 1195 (9th Cir.2008).

Similarly, where the plaintiff "fails to state a claim upon which relief can be granted," the court must dismiss the action. Fed.R.Civ.P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). For the purpose of the motion to dismiss, the complaint is liberally construed in favor of the plaintiff and its allegations are taken as true. *Rosen v. Walters,* 719 F.2d 1422, 1424 (9th Cir.1983). However, bare assertions that amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Ashcroft v. Tgbal,* 556 U.S. 662, 681 (2009). Rather, to state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. *Starr v. Bacca,* 652 F.3d 1202, 1216, *reh'g en banc denied,* 659 F.3d 850 (9th Cir.2011).

## DISCUSSION

Defendants assert that plaintiff's complaint must be dismissed because this Court lacks subject-matter jurisdiction. In addition, defendants contend that plaintiff fails to state plausible claims for relief.

### I. *Motions for Judicial Notice*
 **\*3** To support their motion to dismiss, defendants request that this Court take judicial notice of: plaintiff's Certificate and Articles of Incorporation, filed on October 13, 2011; the Deed of Trust; the Notices of Default and Elections to Sell; the Assignment of the Deed of Trust; the Appointment of Successor Trustee; the Rescission of the Notice of Default; the Reids' petition for relief under Chapter 7 of the Bankruptcy Code; the bankruptcy court docket for the Reids' case; a printout of an online advertisement for plaintiff, describing its business strategy; *Niday v. GMAC Mortg.,* Case No. CV 10–02–0001, Transcript of Proceedings (Clackamas Cnty. Cir. Crt. Oct. 28, 2010); *Buckland v. Aurora Loan Servs.,* Case No. 10–CV–1023, Judgment (Josephine Cnty. Cir. Crt. March 18, 2011); *Spencer v. Guaranty Bank,* Case No. 10CV0515ST, Memo. Op. (Deschutes Cnty. Cir. Crt. May 5, 2011); *Nigro v. Northwest Tr. Servs., Inc.,* Case No. 11–CV–0135, Letter Op. (Josephine Cnty. Cir. Crt. May 11, 2011); *U.S. Bank v. Flynn,* Case No. 11–8011, Letter Op. (Columbia Cnty. Cir. Crt. June 23, 2011); *Somers v. Deutsche Bank Nat'l Trust Co.,* Case Nos. CV 11–02–0133 and FE 110027, Letter Op. (Clackamas Cnty. Cir. Crt. July 6, 2011); *Yovko v. Northwest Tr. Servs., Inc.,* Case No. C11–0703CV, Order (Washington Cnty. Cir. Crt. Aug. 3, 2011); *Yovko v. Northwest Tr. Servs., Inc.,* Case No. C11–0703CV, Order (Washington Cnty. Cir. Crt. Nov. 22, 2011); *Fed. Nat'l Mortg. Assoc. v. Goodrich,* Case No. 11001639E, Judgment (Jackson Cnty. Cir. Crt. Dec. 7, 2011); *Melli v. ReconTrust Co.,* Case No. C12–0112CV, Order (Washington Cnty. Cir. Crt. Jan. 11, 2012); *Lind v. Fidelity Nat'l Title Ins. Co.,* Case No. C116471CV, Order (Washington Cnty. Cir. Crt. Jan. 23, 2012); and *Mashia v. Northwest Tr. Servs., Inc.,* Case No. 1008–12752, Op. and Order (Multnomah Cnty. Cir. Crt. Jan. 23, 2012). Plaintiff does not oppose defendants' motions.

Review of a 12(b)(6) motion is generally limited to the complaint. *United States v. Ritchie,* 342 F.3d 903, 907 (9th Cir.2003). However, a "court may take judicial notice of 'matters of public record." ' *Lee v. City of Los Angeles,* 250

F.3d 668, 689 (9th Cir.2001) (quoting *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986)). Further, a court may take judicial notice of extrinsic documents if they are integral to the plaintiff's claims and their authenticity is undisputed. *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 n. 4 (9th Cir.1998).

Under the Federal Rules of Evidence, a "judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201; *see also Ritchie,* 342 F.3d at 909. Facts subject to judicial notice may be considered on a motion to dismiss. *Mullis v. U.S. Bankruptcy Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987).

**\*4** The relevant facts in this case are largely undisputed. Further, most of the documents that defendants seek judicial notice of are recorded in the official records of Douglas County or case law, which are already part of the public record and are therefore capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

With the exception of plaintiff's online advertisement, I find that the additional documents introduced by defendants are also not subject to reasonable dispute. Plaintiff's online advertisement, however, is not part of the public record and, additionally, does not meet the requirements of Fed.R.Evid. 201. Moreover, plaintiff did not incorporate this document by reference, as plaintiff does not make any mention of its business practices in the complaint, other than to describe the process by which it purchased the Reids' Property. *See* Compl. ¶¶ 19–22. Therefore, except in regard to plaintiff's online advertisement, defendants' requests for judicial notice are granted.

## II. *Motion to Dismiss*

The issue at this stage in the proceedings is whether plaintiff has Article III and prudential standing; or, alternatively, whether plaintiff can allege any plausible claims for relief relating to defendants' attempted foreclosure of the Property.

### A. *Article III Standing*

The standing jurisprudence of federal courts "contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, [and] prudential standing,

which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11 (2004) (citations and internal quotations omitted).

The "irreducible constitutional minimum of standing" requires three elements: 1) plaintiff must have suffered an "injury in fact"; 2) the injury must be "fairly traceable to the challenged action of the defendant"; and 3) "it must be likely ... that the injury will be redressed by a favorable decision." *Lujan,* 504 U .S. at 560–61 (citations and internal quotations omitted).

Defendants contend that plaintiff lacks standing because its " 'injury' resulted from its *own decision* to purchase an encumbered property from a defaulting borrower." Defs.' Memo. in Supp. of Mot. Dism. 9 (emphasis in original). Defendants argue that a "self-inflicted injury like this" does not satisfy the traceability requirements of Article III. *Id.* at 10 (citing *Pennsylvania v. New Jersey,* 426 U.S. 660, 664 (1976)).

Conversely, plaintiff asserts that, "as the owner of the property, [it] will imminently suffer the loss of property for which it has paid consideration ... [t]he fact that [p]laintiff was aware of the imminent injury in no way prevents [p]laintiff from suffering it." Pl.'s Resp. to Mot. Dism. 12. Plaintiff then argues that defendants' reliance on *Pennsylvania v. New Jersey* is misplaced, "because the injury is not being inflicted upon [p]laintiff by [p]laintiff's actions, but by the wrongful foreclosure process initiated and maintained by [d]efendants." *Id* .

**\*5** Thus, it is undisputed that plaintiff knowingly purchased the Property after the Reids materially defaulted on the Note and defendants initiated non-judicial foreclosure proceedings. *Id.; see also* Compl. ¶¶ 19–22. It is also undisputed that plaintiff had no involvement whatsoever in the lending process and is not named in, or a party to, any of the loan or foreclosure documents. *See generally* Deed of Trust; Assignment of the Deed of Trust; Notices of Default and Elections to Sell; Rescission of the Notice of Default; Appointment of Successor Trustee; *see also* Compl. ¶ 5 (the Note "is solely between [the] Reid[s] ... and Lender"). Moreover, the record reveals that the Reids took out the loan for the Property in their individual capacities and for their own residential use. Accordingly, the allegations in plaintiff's complaint all stem from defendants' response to the Reids' inability to make the requisite payments under the Note.

Case 15-31954-rld7   Doc 27   Filed 08/10/15

Therefore, plaintiff did not suffer an injury that is fairly traceable to the challenged actions of defendants. *See AOM Group, LLC v. Downey Sav. & Loan Ass'n, F.A.,* 2010 WL 3342024, *1 n. 1 (D.Ariz. Aug. 25, 2010) (company that purchased properties from borrowers in default in order to challenge the statutory non-judicial foreclosure proceedings lacked constitutional standing, citing *Fleck & Assocs., Inc. v. City of Phoenix,* 471 F.3d 1100, 1104 (9th Cir.2006)); *AOM Group LLC v. Provident Funding Assocs. LP,* 2010 WL 3342020, *1 (D.Ariz. Aug. 25, 2010) (same). Rather, defendants are correct that, to the extent that plaintiff suffered an injury, it was due to plaintiff's own actions in purchasing the Property after non-judicial foreclosure proceedings had been commenced.

Further, the record makes clear that plaintiff's sole purpose in initiating this suit was to frustrate and delay non-judicial foreclosures under the OTDA in order to exact a settlement from the lender; plaintiff capitalizes on this ruse by purchasing properties, at a fraction of their value, from borrowers who have already materially defaulted on their loan obligations. *See* Compl. ¶¶ 19–22; *see also* Compl. Ex. 3 at pg. 1 (contract conveying the Property from the Reids to plaintiff makes payment of 90% of the purchase price contingent upon plaintiff's ability to satisfactorily settle its claims against defendants).

These are precisely the circumstances that Article III's standing requirements seek to prevent federal courts from presiding over. As such, because plaintiff lacks Constitutional standing, this Court does not have subject-matter jurisdiction. Therefore, defendants' motion to dismiss is granted.

**B.** *Prudential Standing*
Regardless, even if plaintiff was able to meet the "irreducible constitutional minimum of standing" mandated by Article III, this action would nonetheless be dismissed due to prudential considerations.

The "prudential component of standing precludes the exercise of [subject-matter jurisdiction] even where the Constitution's 'irreducible minimum' requirements have been met." *Or. Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1108 (9th Cir.2003); *see also Allen v. Wright,* 468 U.S. 737, 751 (1984) (the court lacks subject-matter jurisdiction, due to prudential limitations, where a plaintiff "rais[es] another person's legal rights" or where a "complaint [does not] fall within the zone of interests protected by the law invoked").

**\*6** Accordingly, defendants also assert that this action must be dismissed because plaintiff's claims are premised on the legal rights or interests of the Reids, a non-party to this suit. In addition, plaintiff contends that the OTDA was only intended to protect those who have a duty to repay the Note and, as such, plaintiff "does not come within the 'zone of interests' that the OTDA was enacted to protect." Defs.' Memo. in Supp. of Mot. Dism. 10.

Plaintiff does not respond to defendants' argument relating to the "zone of interests" protected by the OTDA, but does contend that this action is not barred by prudential considerations because "[p]laintiff is not seeking to exercise the rights of any third party, it is seeking to exercise its own right as the owner of the [P]roperty." Pl.'s Resp. to Mot. Dism. 13.

**i.** *Third–Party Standing*
"As a general rule, a third-party does not having standing to bring a claim asserting a violation of someone else's rights." *Martin v. Cal. Dep't of Veterans Affairs,* 560 F.3d 1042, 1050 (9th Cir.2009) (citing *Powers v. Ohio,* 499 U.S. 400, 410 (1991)). This rule exists to avoid "the adjudication of rights which those not before the [c]ourt may not wish to assert, and [to ensure] that the most effective advocate of the rights at issue is present to champion them." *Elk Grove,* 542 U.S. at 15 n. 7 (citations and internal quotations omitted).

Accordingly, the rule applies even when the very same allegedly illegal act that affects the litigant also affects a third-party. *See United States v. Pavner,* 447 U.S. 727, 731–732 (1980). While there are a number of exceptions to this general rule, plaintiff does not argue, and the Court does not find, that any of these exceptions apply.

Thus, the sole issue is whether plaintiff's claims are premised upon its own rights or those of a third-party. As discussed above, plaintiff was not the original borrower and had no involvement in the lending process. Although plaintiff purports to have acquired the Property, plaintiff does not allege that it is a party to the Note or Deed of Trust. Moreover, under the terms of the Deed of Trust, the Reids were required to have written permission from the lender, or its successors and assigns, in order to transfer or sell their interest in the Property, which plaintiff does not allege occurred in this case. *See* Deed of Trust at 10. Accordingly, the Reids, rather than plaintiff, remain the parties required to repay the Note.

Case 15-31954-rld7    Doc 27    Filed 08/10/15

As such, plaintiff's complaint asserts the rights of a third-party, as defendants' allegedly wrongful non-judicial foreclosure proceedings infringed only upon the Reids' interests. [4] *See HPG Corp. v. Aurora Loan Servs., LLC, 436 B.R. 569, 580 (E.D.Cal.2010)* (corporation did not have prudential standing, on behalf of homeowners in default on their loan obligations, to challenge the lender's alleged failure to follow statutory non-judicial foreclosure procedures). The fact that plaintiff interjected itself into defendants' non-judicial foreclosure, via a real estate purchase contract, in order to profit from the Reids' unfortunate circumstances cannot remedy this defect.

**\*7** Finally, plaintiff fails to demonstrate any hindrance the Reids' ability to protect their own interests. Rather, the influx of cases arising out of non-judicial foreclosures around the country demonstrate that homeowners are capable of asserting their own rights. *See Bertrand v. Suntrust Mortg., Inc., 2011 WL 1113421, \*1 (D.Or. March 23, 2011)* (noting the "veritable tsunami of investigation into and litigation over mortgage foreclosure practices"). The fact that individuals in foreclosure proceedings may be unable to hire legal counsel is not "the type of hindrance necessary to allow another to assert the indigent [party's] rights." *Kowalski v. Tesmer, 543 U.S. 125, 132 (2004)*. Accordingly, plaintiff does not have prudential standing to bring the claims asserted in the complaint. Therefore, plaintiff's claims must be dismissed for this additional reason.

### ii. *"Zone of Interests" Protected by the OTDA*

In assessing the "zone of interests" protected by a statute, a court need not "inquire whether there has been a congressional intent to benefit the would-be plaintiff," but instead must determine only whether the plaintiff's interests are among those "arguably ... to be protected" by the statutory provision. *Nat'l Credit Union v. First Nat'l Bank & Trust Co., 552 U.S. 478, 489 (1998)*. As such, the "zone of interests" test

"is not meant to be demanding." *Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 399–400 (1987)*.

Despite this low threshold, plaintiff nevertheless does not fall within the "zone of interests" created by the OTDA. The OTDA was enacted "to protect [borrowers] from the unauthorized foreclosure and wrongful sale of property, while at the same time providing [lenders] with a quick and efficient remedy." *Staffordshire Inv., Inc. v. Cal–Western Reconveyance Corp., 209 Or.App. 528, 542, 149 P.3d 150 (2006)*. To accomplish this goal, the OTDA requires that the lender strictly comply with its provisions in order to effectuate non-judicial foreclosure. *Id.; James v. Recontrust Co., 2012 WL 653871, \*5 (D.Or. Feb. 29, 2012); see also Or.Rev.Stat. §§ 86.705–86.795*.

As such, there is nothing the in the OTDA that even arguably was intended to protect corporate entities, such as plaintiff, that purchase properties already in default and seek to profit by extracting a settlement from the lender. Therefore, this Court lacks subject-matter jurisdiction because plaintiff's interests do not fall within the purview of the OTDA.

### CONCLUSION

Defendants' Request for Judicial Notice (doc. 12) is GRANTED, except in regard to plaintiff's online advertisement, as to which the motion is DENIED. Defendants' Supplemental Motion for Request for Judicial Notice (doc. 16) is GRANTED. Further, defendants' Motion to Dismiss (doc. 10) is GRANTED. Accordingly, defendants' request for oral argument is DENIED as unnecessary. This case is DISMISSED and all pending motions are DENIED as moot.

**\*8** IT IS SO ORDERED.

Footnotes

1    Defendants' Supplemental Motion for Request for Judicial Notice is granted in its entirety; defendants' Request for Judicial Notice is also granted, in regard to plaintiff's online advertisement, as to which the motion is denied.

2    The Reids are not a party to this litigation.

3    Plaintiff did not actually become a formal business entity until October 13, 2011, two days after it bought the Property from the Reids and one day after it filed the present action. In addition, plaintiff was not licensed to do business in Oregon until January 17, 2012. *See* Pl.'s Resp. to Mot. Dism. 13.

4    In many instances, plaintiff appears to allege that it was the original borrower. Compl. ¶¶ 68, 70, 78, 83. For example, the complaint asserts that "[p]laintiff was not in default on May 31, 2011," which was months before plaintiff even purchased the Property from

the Reids. *Id.* at ¶ 83. Thus, the pleadings themselves belie plaintiff's assertion that it's claims are not premised on the rights of a third-party.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 15-31954-rld7    Doc 27    Filed 08/10/15

2012 WL 1870752
Only the Westlaw citation is currently available.
United States District Court,
D. Oregon.

BIG BLUE CAPITAL PARTNERS, LLC, Plaintiff,
v.
RECONTRUST COMPANY, N.A.; The Bank of
New York Mellon fka The Bank of New York, as
trustee for the benefit of Cwalt, Inc., alternative
loan trust 2006–45T1 mortgage pass through
certificates, series 2006–45T1; and Mortgage
Electronic Registration Systems, Inc.; Defendants.

No. 6:11–CV–1412–TC.    |    May 21, 2012.

**Attorneys and Law Firms**

Jeffrey A. Myers, John P. Bowles, Bowles Fernandez Law
LLC, Lake Oswego, OR, for Plaintiff.

Kristen L. Tranetzki, Pilar C. French, Lane Powell, PC,
Portland, OR, for Defendants.

**OPINION AND ORDER**

COFFIN, Magistrate J.

 *1  Defendants ReconTrust Company, N.A. ("ReconTrust"),
the Bank of New York Mellon fka the Bank of New York
("BNYM"), and Mortgage Electronic Registration Systems,
Inc. ("MERS") move to dismiss plaintiff Big Blue Capital
Partners, LLC's complaint pursuant to Fed.R.Civ.P. 12(b)(1)
and Fed.R.Civ.P. 12(b)(6). The motion has been fully briefed
and this court heard oral argument on the matter. [1] As set forth
below, the motion to dismiss is allowed due to plaintiff's lack
of standing.

Judge Aiken recently dismissed a similar case for lack of
standing. *Big Blue Capital Partners, LLC v. ReconTrust
Company N.A .,* Case No. 6: 11–cv–6368AA. That case and
the present case essentially have the same parties, very similar
facts and the same attorneys. This court agrees with the
reasoning of Judge Aiken's opinion and, as discussed in more
detail below, it is appropriate to dismiss the present case for
a lack of standing.

**BACKGROUND**

In October, 2006, Daryl and Janet Richardson [2] took out a
loan from Countrywide Home Loans ("Countrywide") in the
amount of $1,500,000, to purchase property (the "Property").
Pursuant to this transaction, the Richardsons executed a
promissory note (the "Note") in favor of Countrywide. The
Note was secured by a trust deed (the "Deed of Trust"), which
lists Countrywide as the lender and MERS as the beneficiary.
The Deed of Trust was filed in Douglas County, Oregon.

Pursuant to the Deed of Trust, the Richardsons agreed to make
monthly mortgage payments as required under the Note; the
Richardsons also agreed that they would be in default, and
subject to foreclosure, if they failed to make such payments.
In addition, the Deed of Trust required the Richardsons to
obtain approval, in writing, before selling or transferring their
interest in the Property.

The Richardsons stopped making the required loan payments
two years ago and defaulted. MERS thereafter executed
and caused to be recorded an Assignment of Deed of
Trust to BNYM, in care of BAC Home Loan Servicing
LP, in the Douglass County Records Office. BNYM,
through BAC Home Loan Servcing LP, executed and
caused to be recorded an Appointment of Successor Trustee,
appointing ReconTrust, in the Douglass County Record's
Office. ReconTrust then commenced non-judicial foreclosure
proceedings by recording a Notice of Default and Election
to Sell on October 27, 2010, in the Douglass County
Records Office. ReconTrust cancelled and withdrew the
Notice of Default and Election to Sell on February 24,
2011. ReconTrust again commenced non-judicial foreclosure
proceedings, by recording a Notice of Default and Election
to Sell on June 10, 2011, in the Douglass County Record's
Office. This Notice of Default set the foreclosure sale for
October 17, 2011, but the sale has not yet occurred.

On October 17, 2011, the same day on which the Trustee's
Sale was to occur, the Richardsons executed a quitclaim deed
purporting to convey their interest in the Property to plaintiff.
Plaintiff is a limited liability company that was created under
the laws of Ohio. Although the Deed of Trust requires lender
approval for this sale, plaintiff does not allege that it or the
Richardsons sought or obtained such approval.

 *2  On October 18, 2011—one day after acquiring the
property by quitclaim deed—plaintiff filed a complaint in

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.


Exhibit D

Douglas County Circuit Court. Plaintiff asserted several claims against defendants arising out of defendants' alleged failure to comply with the non-judicial foreclosure procedures outlined in the Oregon Trust Deed Act ("OTDA"). Defendants removed the action to this court on the basis of diversity jurisdiction.

### STANDARDS

Where the court lacks subject-matter jurisdiction, the action must be dismissed. Fed.R.Civ.P. 12(b)(1). A challenge to standing is appropriately raised pursuant to Fed.R.Civ.P. 12(b)(1). *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir.2010). The party who seeks to invoke the subject-matter jurisdiction of the court has the burden of establishing that such jurisdiction exists. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In such instances, the court may hear evidence regarding subject-matter jurisdiction and resolve factual disputes where necessary; however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the [court] from evaluating for itself the merits of jurisdictional claims." *Kingman Reef Atoll Invs., LLC v. United States,* 541 F.3d 1189, 1195 (9th Cir.2008).

### DISCUSSION

Defendants assert that plaintiff's complaint must be dismissed for lack of subject-matter jurisdiction as plaintiff lacks both Article III standing and prudential standing.

The standing jurisprudence of federal courts "contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, [and] prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (citations and internal quotations omitted).

#### A. *Article III Standing*
The "irreducible constitutional minimum of standing" requires three elements: 1) plaintiff must have suffered an "injury in fact"; 2) the injury must be "fairly traceable to the challenged action of the defendant"; and 3) "it must be likely ... that the injury will be redressed by a favorable

decision." *Lujan,* 504 U.S. at 560–61 (citations and internal quotations omitted).

Defendants contend that plaintiff lacks standing because its "injury" resulted from its *own decision* to purchase an encumbered property from a defaulting borrower. Defendants argue that this self-inflicted injury does not satisfy the traceability requirements of Article III. *Id.* at 10 (citing *Pennsylvania v. New Jersey,* 426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976)).

Plaintiff asserts that as the owner of the property, it will imminently suffer the loss of property for which it has paid consideration and the fact that plaintiff was aware of the imminent injury in no way prevents plaintiff from suffering it. Plaintiff then argues that defendants' reliance on *Pennsylvania v. New Jersey* is misplaced because the injury is not being inflicted upon plaintiff by plaintiff's actions, but by the wrongful foreclosure process initiated and maintained by defendants.

**\*3** It is undisputed that plaintiff knowingly purchased the Property after the Richardsons defaulted on the Note and defendants initiated non-judicial foreclosure proceedings. It is also undisputed that plaintiff had no involvement whatsoever in the lending process and is not named in, or a party to, any of the loan or foreclosure documents. Moreover, the record reveals that the Richardsons took out the loan for the Property in their individual capacities and for their use.

As set forth above, the allegations in plaintiff's complaint all stem from defendants' response to the Richardsons inability to make the requisite payments under the Note. As such, plaintiff did not suffer an injury that is fairly traceable to the challenged actions of defendants. *See AOM Group, LLC v. Downey Sav. & Loan Ass'n, F.A.,* 2010 WL 3342024, \*1 n. 1 (D.Ariz. Aug.25, 2010) (company that purchased properties from borrowers in default in order to challenge the statutory non-judicial foreclosure proceedings lacked constitutional standing, citing *Fleck & Assocs., Inc. v. City of Phoenix,* 471 F.3d 1100, 1104 (9th Cir.2006)); *AOM Group LLC v. Provident Funding Assocs. LP,* 2010 WL 3342020, \*1 (D.Ariz. Aug.25, 2010) (same). To the extent that plaintiff suffered an injury, it was due to plaintiff's own actions in purchasing the Property after non-judicial foreclosure proceedings had been commenced. [3]

#### B. *Prudential Standing*

Case 15-31954-rld7   Doc 27   Filed 08/10/15

Even if plaintiff was able to meet the "irreducible constitutional minimum of standing" mandated by Article III, dismissal of this action would be appropriate due to prudential considerations.

The "prudential component of standing precludes the exercise of [subject-matter jursidiction] even where the Constitution's 'irreducible minimum' requirements have been met." *Or. Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1108 (9th Cir.2003); *see also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (the court lacks subject-matter jurisdiction, due to prudential limitations, where a plaintiff "rais[es] another person's legal rights" or where a "complaint [does not] fall within the zone of interests protected by the law invoked").

Defendants assert that this action must be dismissed because plaintiff's claims are premised on the legal rights or interests of the Richardsons, a non-party to this suit. In addition, plaintiff contends that the OTDA was only intended to protect those who have a duty to repay the Note and, as such, plaintiff does not come within the "zone of interests" that the OTDA was enacted to protect.

Plaintiff does not respond to defendants' argument relating to the "zone of interests" protected by the OTDA, but does contend that this action is not barred by prudential considerations because plaintiff is not seeking to exercise the rights of any third party and is seeking to exercise its own right as the owner of the Property.

### i. *Third–Party Standing*

"As a general rule, a third-party does not having standing to bring a claim asserting a violation of someone else's rights." *Martin v. Cal. Dep't of Veterans Affairs,* 560 F.3d 1042, 1050 (9th Cir.2009) (citing *Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). This rule exists to avoid "the adjudication of rights which those not before the [c]ourt may not wish to assert, and [to ensure] that the most effective advocate of the rights at issue is present to champion them." *Elk Grove,* 542 U.S. at 15 n. 7 (citations and internal quotations omitted). The rule applies even when the very same allegedly illegal act that affects the litigant also affects a third party. *See United States v. Payner,* 447 U.S. 727, 731–732, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). While there are a number of exceptions to this general rule, plaintiff does not argue, and this court does not find, that any of these exceptions are applicable here.

**\*4** Plaintiff's claims are not premised upon its own rights, but on the rights of a third-party. As discussed above, plaintiff was not the original borrower and had no involvement in the lending process. Although plaintiff purports to have acquired the Property, plaintiff does not allege that it is a party to the Note or Deed of Trust. Moreover, under the terms of the Deed of Trust, the Richardsons were required to have written permission from the lender, or its successors and assigns, in order to transfer or sell their interest in the Property, which plaintiff does not allege occurred in this case. Accordingly, the Richardsons, rather than plaintiff, remain the parties required to repay the Note. As such, defendants' allegedly wrongful non-judicial foreclosure proceedings infringed upon the Richardsons' rights. Plaintiff's complaint therefore asserts the rights of a third-party rather than its own. *See HPG Corp. v. Aurora Loan Servs., LLC,* 436 B.R. 569, 580 (E.D.Cal.2010) (corporation did not have prudential standing to pursue claims against the lender, on behalf of homeowners in default on their loan obligations, based upon lender's alleged failure to follow statutory procedures when conducting non-judicial foreclosures). The fact that plaintiff interjected itself into defendants' non-judicial foreclosure, via a real estate purchase contract, in order to profit from the Richarsdsons' unfortunate circumstances cannot remedy this defect.

Plaintiff has also failed to demonstrate any hindrance to the Richardsons' ability to protect their own interests. Rather, the influx of cases arising out of foreclosures around the country demonstrates that homeowners facing foreclosure are capable of asserting their own rights. *See Bertrand v. Suntrust Mortg., Inc.,* 2011 WL 1113421, *1 (D.Or. March 23, 2011) (noting the "veritable tsunami of investigation into and litigation over mortgage foreclosure practices"). The fact that individuals in foreclosure proceedings may be unable to hire counsel is not "the type of hindrance necessary to allow another to assert the indigent [party's] rights." *Kowalski v. Tesmer,* 543 U.S. 125, 132, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004).

### ii. *"Zone of Interests" Protected by the OTDA*

In assessing the "zone of interests" protected by a statute, a court need not "inquire whether there has been a congressional intent to benefit the would-be plaintiff," but instead must determine only whether the plaintiff's interests are among those "arguably ... to be protected" by the statutory provision. *Nat'l Credit Union v. First Nat'l Bank & Trust Co.,* 552 U.S. 478, 489 (1998). As such, the "zone of interests" test "is not meant to be demanding." *Clarke v. Secs. Indus.*

Case 15-31954-rld7   Doc 27   Filed 08/10/15

*Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

Despite this low threshold, plaintiff does not fall within the "zone of interests" protected by the OTDA. The OTDA was enacted "to protect [borrowers] from the unauthorized foreclosure and wrongful sale of property, while at the same time providing creditors with a quick and efficient remedy." *Staffordshire Inv., Inc. v. Cal–Western Reconveyance Corp.,* 209 Or.App. 528, 542, 149 P.3d 150 (2006). To accomplish this goal, the OTDA requires that the creditor strictly comply with its provisions in order to effectuate non-judicial foreclosure. *Id.; James v. Recontrust Co.,* 2012 WL 653871, *5 (D.Or. Feb.29, 2012); *see also* Or.Rev.Stat. §§ 86.705–86.795.

**\*5** In short, there is nothing in the OTDA that even arguably was intended to protect corporate entities, such as plaintiff, that purchase properties already in default and seek to profit by extracting a settlement from the creditor. Therefore, this court lacks subject-matter jurisdiction because plaintiff's interests do not fall within the purview of the OTDA.

### CONCLUSION

The motion(# 25) to withdraw as counsel for plaintiff is allowed. Defendants' requests for judicial notice (# 13, # 18) are allowed. Defendants' Motion to Dismiss (# 11) is also allowed and this action is dismissed.

IT IS SO ORDERED.

Footnotes

1    Defendants have also filed requests (# 13, # 18) for judicial notice which are not opposed and are allowed. A motion (# 25) to withdraw as counsel for plaintiff was recently filed and is allowed.

2    The Richardsons are not a party to this litigation.

3    Moreover, it appears that plaintiff's sole purpose in initiating this action was to frustrate and delay non-judicial foreclosures under the OTDA in order to exact a settlement from the lender; plaintiff capitalizes on this ruse by purchasing properties, at a fraction of their value, from borrowers who have already defaulted on their loan obligations.

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2049455
Only the Westlaw citation is currently available.
United States District Court,
D. Oregon.

BIG BLUE CAPITAL a/b/n Big
Blue Capital Partners, Plaintiff,
v.
RECONTRUST COMPANY, N.A.; JPMorgan
Chase Bank, as trustee for GS Mortgage
Securities Corp GSR Mortgage Loan Trust
2004–7; and Bank America as successor by
merger to BAC Home Loan Servicing LP FKA
Countrywide Home Loan Servicing, Defendants.

No. 3:12–cv–00448–AA.  |  June 4, 2012.

**Attorneys and Law Firms**

Jeffrey A. Myers, John P. Bowles, Timothy J. Zimmerman, Bowles Fernandez Law, LLC, Lake Oswego, OR, for Plaintiff.

Kristen L. Tranetzki, Pilar C. French, Lane Powell, PC, Portland, OR, for Defendants.

### ORDER

AIKEN, Chief Judge:

 **\*1**  Defendants ReconTrust Company, N.A., JPMorgan Chase Bank, and Bank of America move to dismiss plaintiff Big Blue Capital Partners' claims pursuant to Fed.R.Civ.P. 12(b)(1) and Fed, R. Civ. P. 12(b)(6). For the reasons set forth below, defendants' motion is granted and this case is dismissed.

In April 2004, Michael and Raquel Rich [1] took out a loan from Countrywide Home Loans, Inc. ("Countrywide"), in the amount of $432,000, to purchase a residential property (the "Property"). Pursuant to this transaction, the Riches executed a promissory note (the "Note") in favor of Countrywide. The Note was secured by a trust deed (the "Deed of Trust"), which lists Countrywide as the lender, Mortgage Electronic Registration Systems, Inc. ("MERS") as the beneficiary, and CTC Real Estate Services as the trustee. The Deed of Trust was duly recorded in Clackamas County, Oregon.

Pursuant to the Deed of Trust, the Riches agreed to make monthly mortgage payments as required under the Note; the Riches also agreed that they would be in default, and subject to foreclosure, if they failed to make such payments. In addition, the Deed of Trust required the Riches to obtain approval, in writing, before selling or transferring their interest in the Property.

In 2008, the Riches stopped making the requisite loan repayments, thereby materially defaulting. In March 2009, MERS appointed ReconTrust Company, N.A. ("ReconTrust") to serve as successor trustee for the Deed of Trust. Thereafter, ReconTrust executed a Notice of Default and Election to Sell the Property. The Appointment of Successor Trustee and Notice of Default and Election to Sell were documented in the official records of Clackamas County. In January 2010, ReconTrust formally rescinded the Notice of Default and Election to Sell.

In June 2010, MERS assigned the Deed of Trust to Deutsche Bank. Deutsche Bank again appointed ReconTrust to serve as successor trustee; ReconTrust then issued a second Notice of Default and Election to Sell the Property. The Assignment of the Deed of Trust, Appointment of Successor Trustee, and Notice of Default and Election to Sell were recorded in Clackamas County. In March 2011, ReconTrust formally rescinded the second Notice of Default and Election to Sell.

In April 2011, Deutsche Bank assigned the Deed of Trust to BAC Home Loan Servicing, LP and ReconTrust issued a third Notice of Default and Election to Sell the Property. These documents were duly recorded in the official records of Clackamas County.

In November 2011, the Riches filed a petition for relief under Chapter 13 of the Bankruptcy Code. The petition identified the value of their interest in the Property as $450,000, subject to two secured claims by "Bank of America." [2] The Riches, however, did not list any purported claims against defendants as assets.

In January 2012, the bankruptcy court confirmed the Riches' Chapter 13 plan and lifted the automatic stay, which precluded the pending non-judicial foreclosure of the Property. Accordingly, ReconTrust reinstituted foreclosure proceedings by issuing an Amended Notice of Sale. The Amended Notice scheduled the sale of the Property for March 15, 2012. A foreclosure sale has not yet occurred.



Case 15-31954-rld7    Doc 27    Filed 08/10/15

**\*2** On March 7, 2012, the Riches executed a bargain and sale deed, conveying their interest in the Property to plaintiff, a limited liability company created under the laws of Ohio. Pursuant to that contract, plaintiff agreed to pay the Riches $3,000 in exchange for the Property. Plaintiff, however, did not assume any obligation to repay the Note pursuant this transaction. Further, the Riches did not obtain written consent from their lender prior to transferring their interest in the Property, as required by the Deed of Trust.

On March 13, 2012, plaintiff filed a complaint in this Court; plaintiff asserts two claims against defendants, both arising out of defendants' alleged failure to comply with the non-judicial foreclosure procedures outlined in the Oregon Trust Deed Act ("OTDA"). Subsequently, defendants moved to dismiss this case, asserting, in part, that plaintiff does not have standing.

Where the court lacks subject-matter jurisdiction, the action must be dismissed. Fed.R.Civ.P. 12(b)(1). A challenge to standing is appropriately raised pursuant to Fed.R.Civ.P. 12(b)(1). *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir.2010). The party who seeks to invoke the subject-matter jurisdiction of the court has the burden of establishing that such jurisdiction exists. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). In such instances, the court may hear evidence regarding subject-matter jurisdiction and resolve factual disputes where necessary; however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the [court] from evaluating for itself the merits of jurisdictional claims." *Kingman Reef Atoll Invs., LLC v. United States,* 541 F.3d 1189, 1195 (9th Cir.2008).

Plaintiff has filed a number of actions in this District that arise out of virtually identical facts and involve essentially the same parties and attorneys; in each instance, the case was dismissed pursuant to Fed.R.Civ.P. 12(b)(1) because plaintiff did not have standing. *See Big Blue Capital Partners, LLC v. ReconTrust Co., N.A. ("Big Blue I"),* 2012 WL 1605784, \*4–7 (D.Or. May 4, 2012); *Big Blue Capital Partners, LLC v. Recontrust Co., N.A, ("Big Blue II"),* 2012 WL 1870752, \*2–5 (D.Or. May 21, 2012). [3]

Specifically, as this Court recently explained, plaintiff lacked standing under Article III of the Consitution because it "knowingly purchased the Property after the [borrower] materially defaulted on the Note and defendants initiated non-judicial foreclosure proceedings." *See Big Blue I,* 2012 WL 1605784 at \*5. As such, plaintiff did not suffer an injury that was fairly traceable to defendants' challenged actions. *Id.*

Moreover, prudential standing was absent because plaintiff's claims were premised on a third-party's rights; namely, plaintiff's claims arose out of harm suffered by the non-party borrowers as a result of defendants' alleged failure to follow the non-judicial foreclosure procedures articulated in the OTDA. *Id.* at \*7. Plaintiff also did not have prudential standing because the OTDA "was [not] intended to protect corporate entities [that] purchase properties already in default and seek to profit by extracting a settlement from the lender." *Id.* Therefore, for the reasons set forth in *Big Blue I* and *Big Blue II,* this Court lacks subject-matter jurisdiction.

### CONCLUSION

**\*3** Defendants' Motion to Dismiss (doc. 13) is GRANTED. The parties' requests for oral argument are DENIED as unnecessary. Finally, this case is DISMISSED and all pending motions are DENIED as moot.

IT IS SO ORDERED.

Footnotes

1    The Riches are not a party to this litigation.

2    In addition to their initial mortgage, the Riches executed a second lien against the Property in the amount of $82,278, which is not at issue in this case.

3    Plaintiff also has a case pending before Judge Mosman. *See Big Blue Capital Partners, LLC v. Recontrust Co., N.A.,* Case No. 3:12–cv–00292–MO.

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.